**In re KELLETT AIRCRAFT CORP.**
No. 22616.

United States District Court
E. D. Pennsylvania.

Nov. 22, 1950.

See also 85 F.Supp. 525.

Charles A. Wolfe, Philadelphia, Pa., for trustees.

Joseph J. Brown, Philadelphia, Pa., for Coldaire Corp.

Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for debtor.

McGRANERY, District Judge.

This case arises on debtor's exceptions to the report and supplemental report and recommendations of the special master on the amended reclamation petition of the Coldaire Corporation, in the reorganization proceedings of the Kellett Aircraft Corporation. Factual background of the proceedings appears in the opinion of this Court reported in 77 F.Supp. 959. The master has recommended the allowance of Coldaire's claims (a) in the amount of $40,260 paid by it to the debtor for certain tooling, (b) in the amount of $2,890 as the value of certain condensing units, and (c) in the amount of $5,000 as the value of certain drawings; and he has recommended the disallowance of a counterclaim by the debtor based on some allegedly outstanding and unpaid items on its books against Coldaire.

### Findings of Fact

1. On April 2, 1946, a contract was entered into between the parties herein whereby the debtor was to manufacture a quantity of refrigerating cabinets for Coldaire in accordance with design and specification furnished by the latter, and the debtor was also to fabricate the tools necessary to such manufacture. The pertinent provisions of the contract were:

"Article I Statement of the Work"

"* * * Kellett shall also fabricate the tools * * * specified in Appendix 'B' * * * at the prices indicated therein, which tools have been determined by Kellett to be necessary and sufficient for the proper fabrication of said units in the quantities indicated * * *."

"Article III Payments"

"(b) Tools—Coldaire shall make payment to Kellett for the tools as set forth in Appendix 'B' at the prices therein specified, upon completion thereof by Kellett and within thirty (30) days after receipt of invoices from Kellett."

"Appendix 'B'"

| Tools, Dies, Jigs and Fixtures | |
|---|---|
| Description | Price |
| For 3 cubic foot | |
| Frozen Food Storage Cabinets | $19,320.00 |
| For 12 cubic foot | |
| Frozen Food Display Cabinets | $20,940.00" |

"Article IV Specifications and Warranty"

"Kellett shall manufacture all units called for under the terms of this contract in accordance with the plans, designs, specifications and detailed production drawings furnished or approved by Coldaire * * *. All plans, designs, specifications and detailed production drawings shall at all times be the property of Coldaire * * *."

"Article IX Delays and Termination"

"(a) In the event of any arrearage in deliveries in any month * * * Coldaire may, at its option, partially terminate this contract * * *. Kellett may, in its discretion, after the completion of the unterminated balance of the contract, complete and sell any such arrearages so terminated and retain and use the tools provided for herein for such purpose. * * *

"(b) In the event of any such default by Coldaire in any of its obligations hereunder as would entitle Kellett to terminate this contract, and termination by Kellett accordingly, Kellett may in its discretion, sell any completed units that may be undelivered at the time of such termination, and complete all work then in process and sell the resulting units. For the purpose of completing any such work in process,

Kellett shall have the right to retain and use the tools provided for herein. * * *"

"Article XII Entire Agreement"

"The terms and provisions herein contained constitute the entire agreement between the parties and shall supersede all previous communications, representations or agreements, either verbal or written, between the parties hereto with respect to the subject matter hereof."

2. The debtor rendered Coldaire two invoices for the tooling in controversy. The invoices, in the total amount of $40,260 were paid by Coldaire to the debtor.

3. The condensing units listed in paragraph 30 of the amended reclamation petition were fully paid for by Coldaire.

4. On October 9, 1946, the debtor and Coldaire entered into a second contract, which has been held by this Court, 77 F. Supp. 959, affirmed 173 F.2d 689, to have been an accord and satisfaction of any claim by Coldaire for breach of the April contract. The October contract provided, *inter alia,* that:

"7. Kellett will, without charge to Coldaire, turn over to Coldaire * * * all designs, blue prints, production sheets, inspection tags and matters of like nature with respect to the Coldaire units."

"11. Except for the rights and obligations created hereby, all contracts, claims, demands, rights, duties, obligations and liabilities existing at any time up to the time of the execution hereof between Kellett and Coldaire * * * are hereby mutually satisfied, discharged, and released."

5. On October 18, 1946, trustees were appointed for the debtor in reorganization and authorized to conduct the business. Manufacturing operations were continued for a short time under an arrangement between Coldaire and the trustees, but were then halted. On November 22, 1946, the trustees filed a petition requesting permission to reject the agreement of October 9, and permission was granted by the Court in December.

6. Thereafter Coldaire attempted to obtain the tools fabricated by Kellett for the production of Coldaire's cabinets and the plans, designs and drawings prepared in connection with the manufacturing operations. When the attempt proved unsuccessful, Coldaire filed a reclamation petition requesting the release of the property. The petition was amended in order to set forth Coldaire's claims more fully, and to include certain condensing units. Subsequently, upon Coldaire's petition, the prayer for relief was amended to claim the value of the property "at the time of its wrongful conversion by the trustees * * *." Both before and after the filing of the reclamation petitions, the trustees used the tools and drawings alleged to belong to Coldaire for the purpose of manufacturing cabinets.

7. On a motion by the debtor to dismiss, the special master concluded that there was no basis for the claim for conversion of the tools, but suggested that Coldaire be allowed to amend its petition to claim the $40,260 paid the debtor for the tools. The Court accepted the master's suggestion, holding that "Coldaire has a possible claim for $40,260 for the money it paid to Kellett to purchase the tools." Subsequently the reclamation petition was amended to claim that sum "plus the value of the balance of petitioner's aforesaid property as set forth in said petition," including the drawings and condensing units.

## Discussion

■ The debtor controverts the special master's conclusion that Coldaire acquired title to the tools as a result of the April agreement of the parties. That contract, providing for the fabrication of the tools, does not specifically reserve title to Coldaire, but it is not wholly silent on the subject. Article IX as quoted in the first Finding of Fact, defines the debtor's right to "retain and use the tools provided for herein" under certain circumstances of partial termination by Coldaire or termination by Kellett. There would have been no reason to provide for the retention and use of the tools by the trustees if Coldaire was to acquire no rights of ownership under the contract. The inevitable conclusion is that the contract did contemplate a transfer of ownership to Coldaire. And when, under the terms of the agreement, the manufacture of the tools was completed and the

voices rendered thereon were paid, the conclusion that title passed is unavoidable. The conclusion is consistent with the terms of the contract and with normal business usage. With respect to Kellett's contention that there is nothing unusual in an arrangement between a manufacturer of a device and the purchaser for whom it is to be manufactured, under which the manufacturer is to be paid separately for the cost of fabricating the tools needed to manufacture the device in quantity, suffice it to say that there was no evidence before the special master of any such custom; and his finding that the parties were not acting in accordance with such a custom is not clearly erroneous.

It is true, as the debtor points out, that the contract does specifically reserve Coldaire's title to "all plans, designs, specifications, and detailed production drawings." But the plans were useful only in connection with the tools, and the debtor, by admission of its counsel, had no other use for the tools than to carry out its contract with Coldaire. Furthermore, the language of the relevant clause is consistent with the intent to preserve *ab initio* property rights in something which Coldaire would furnish, or create by approval. On the other hand, title to the tooling was to vest in Coldaire by transfer from the debtor. In view of this distinction, the absence of specific language as to the tools does not appear to be a significant omission; and the presence of specific language as to the plans appears to be merely a normal attempt to preserve certain property rights in the initiative of enterprise.

The debtor seeks also to escape the consequences of the fact that, in various pleadings and correspondence, the trustees have heretofore admitted title to the tooling to be in Coldaire. It may be conceded that no finding to the effect that Coldaire had title and right to possession of the tools under the April contract may be made merely on the basis of an original belief of the trustees, formulated under pressure at a time when they were beset by a myriad of other matters, and later concluded to be erroneous. Nor is the debtor estopped by any previous admissions. But in view of the fact that at no time during the approximately four years since the inception of the reclamation petition was there any contention by Kellett that the tools belonged to it, it is certainly permissible to draw an inference from the admissions. Indeed, the debtor insists that its essential position with respect to the tools has always been to assert a lien on them for amounts claimed to be due from Coldaire. Although the issue of title is raised here in opposition to Coldaire's asserted right to a return of the money paid for the fabrication of the tools, in distinction from the opposition to a claim for the delivery of the tools in kind, nevertheless the debtor's position of the assertion of the lien throws light on the meaning of the contract. It is impossible to escape the conclusion that the parties contemplated that title to the tools was to be vested in Coldaire, and that under the terms of the contract, title did so vest upon the payment of the invoices rendered.

The debtor further urges that even though Coldaire did acquire title and the right to possession of the tools under the April contract, they were not fully paid for. It was testified by Mr. R. G. Kellett, vice-president of the debtor, that the tools cost almost twice as much to fabricate as originally contemplated, and that as a result the parties agreed to amortize this additional cost over the total number of cabinets to be produced; hence the sum of $1.44 was included in the unit sale price of the cabinets under that contract. The special master concluded that inasmuch as there was no allegation of fraud, accident or mistake, the contention of the debtor that $40,260 was not the price of the tools could not be accepted in evidence because it varied the terms of the written contract. Gianni v. R. Russell & Co., Inc., 281 Pa. 320, 126 A. 791; Russell v. Barnes Foundation, 3 Cir., 143 F.2d 871. The debtor maintains, however, that this conclusion overlooks the fact that the evidence was produced by Coldaire itself. An examination of the notes of testimony before the special master discloses that the testimony with respect to the variation of the contract was given by the vice-president of the debtor corporation on examination by

Coldaire's attorney, who purported to call the witness as on cross-examination. Under those circumstances it is hardly accurate to describe his testimony as produced by Coldaire itself. See Rule 43(b), Fed. Rules Civ.Proc. 28 U.S.C.A. Coldaire's counsel objected to such of the testimony as attempted to vary the written contract, on the ground of the parol evidence rule, and further pointed to the "Entire Agreement" provision of the April contract, quoted in the first Finding of Fact. The testimony is clearly incompetent under the parol evidence rule. The master properly concluded that the tools were fully paid for by Coldaire, and that Coldaire acquired title to them under the April contract.

The debtor asserts that the "underlying error" in all of the special master's discussion is his failure to recognize or give effect to the facts (a) that the trustees' position was not an absolute denial of Coldaire's alleged right to possession of the tooling and other property which was the subject of the reclamation petition, but merely that this Court, rather than the trustees, should determine by reclamation proceedings whether Coldaire was entitled to delivery of such property; and (b) that Coldaire voluntarily abandoned its effort to get possession of the property and substituted for its reclamation petition a claim for damages for the alleged conversion by the trustees. Apparently the burden of this position is that the trustees were forced to litigate the issue of a technical defense against the claim for conversion, denying title on the ground of a fraudulent transfer, and that they were thus prevented by Coldaire from securing an adjudication of the issue of Coldaire's right to possession as against the validity of the asserted liens. Thus, under this theory, the real issue, whether Coldaire is entitled to physical possession of the tools or whether the trustees are entitled to assert a lien against them, has never been litigated; and consequently Coldaire, as a result of its voluntary action in amending its petition, has never actually been denied possession, but it has merely been denied a claim for conversion.

This argument seems to me to lean too heavily on the trustees' frame of mind, rather than on the facts of the case. The trustees could have defended the claim for the monetary value of the tools, based on an alleged conversion, merely by setting up the asserted liens, and thereby could have secured an adjudication of that issue. The inherent concept of a lien is the right to retain possession of property of another until the debt or duty it secures is paid or discharged. In re Hamburger Distillery, 3 Cir., 115 F.2d 84, 86. Furthermore, if the reclamation petition had not been amended, and had claimed merely physical possession of the tools, the trustees could have defended, and perhaps in the proper performance of their duties might have found it necessary to defend, on the ground of fraudulent transfer; in which event the posture of the case might have been precisely what it is now. Thus the choice of the issues was not necessarily determined by the choice of the remedy sought in the reclamation petition. Whether the petition sought the tools in kind or their value, the fundamental issue—whether Coldaire was entitled to the tools—remained the same. The holding of this Court on the issue litigated, affirmed by the Court of Appeals, was that the trustees had a right to treat the sale of the tools as fraudulent and ineffective as against themselves. It was thereby adjudicated that Coldaire had no right to recover the value of the tools, on the basis, of course, that it had no right to physical possession. The resulting factual situation of the parties is that Coldaire has been denied both the tools and the money it paid the debtor for their manufacture. It is from this inequitable state of affairs that a quasi-contractual right flows, and it is unaffected by any design of the trustees as to the manner in which the issue of Coldaire's right to the tools should have been formulated. The quasi-contractual obligation is "imposed by law upon a person to give value for a benefit conferred when it appears that the benefit was not intended as a gratuity." Stipp v. Doran, 3 Cir., 18 F.2d 83, 84. Certainly Kellett received the benefit of the sum paid by Coldaire for the tools; and

further, after Coldaire was effectively denied physical possession, the trustees used the tools for the purpose of fabricating cabinets of the type that had been contracted for between the parties. It is my view, therefore, that Coldaire, having paid in full for the tools, has been denied possession in a manner adequately justifying the recognition of a quasi-contractual claim based on the money paid for them.

However, the special master, in his report filed June 14, 1950, recommended that Coldaire's claim be denied, on the ground that the mutual release clause of the October contract, quoted in the fourth Finding of Fact, barred the claim. But subsequently, upon the request of Coldaire, the master reconsidered the matter and, in a supplemental report filed July 14, revised his recommendation to provide for the allowance of the Coldaire claim.

The basis of the revised recommendation is that while the mutual release clause of the October contract barred any claim arising out of the April contract, Coldaire's claim did not arise out of the April contract; it merely concerned tools which were fabricated under that contract. The claim arose out of the refusal of the trustees to turn over the tools, after the petition for reorganization and the appointment of trustees. And since the release provision of the October contract antedated the action of the trustees, it does not bar the claim.

If the release in the October contract did not apply to Coldaire's rights with respect to the tools, then it can be fairly concluded that the withholding of the tools by the trustees, subsequent to the execution of the release, is the factual situation giving rise to the claim. As evidence of the meaning of the release, Coldaire points to the trustees' recognition of its title after the execution of the October contract, in their petition for leave to reject that contract, in a letter from trustees' attorney to Coldaire's attorney dated December 4, 1946, in their proposal to Coldaire dated December 9, 1946, and in their answer to the original reclamation petition. Unquestionably statements so made by the trustees indicate a recognition of Coldaire's title. Furthermore, the debtor vigorously insists that the position of the trustees always was and continued to be, and the position of the debtor also is, one of asserting a lien on the tools. This position is inconsistent with the assertion of a release to Coldaire's title. On the contrary, it lends credence to the contention that the trustees did recognize that title under the October contract, a strong indication of the proper interpretation of the release. Additional support for this interpretation is found in the contract of October 14, 1946, wherein certain premises were leased by the debtor to Wilson Refrigeration, Inc. The tooling was omitted from the schedule of "Kellett owned equipment and machinery" attached to that contract.

It appears, therefore, that Coldaire's right to the tools was not in dispute at the time of the October contract. In view of this fact and of the fact that the debtor had no use for the tools other than to carry out its contract with Coldaire, while Coldaire had orders for thousands of cabinets for the production of which the tooling was necessary, the absence of specific mention of the tools in the release provision of the October contract would seem to assume the significance that the provision was not intended to disturb Coldaire's title.

Coldaire's title having been left undisturbed by the October contract, the subsequent refusal of the trustees to deliver the tools to Coldaire gives rise to Coldaire's claim. The trustees' motive, concededly not wrongful, in withholding the tools, does not absolve the debtor of responsibility. Although the courts have held that the trustees properly treated the sale as ineffective as against themselves, on the ground of a fraudulent transfer, nevertheless the resulting state of affairs—the withholding of the tools from Coldaire which had paid for them in full—is an inequitable situation from which a quasi-contractual right flows: a right in Coldaire to receive value in return for a payment which was not intended as a gratuity. It is my opinion that there is adequate justification for the special master's conclusion, in his supplemental report, that the release provision of the October contract

110

is no bar to Coldaire's quasi-contractual claim.

In recommitting to the special master the claim arising out of the amended reclamation petition, the Court directed that he "allow possible defenses and setoffs" and make a "disposition of the other items which are a basis of" the amended petition. At the subsequent hearing, the trustees advanced certain counterclaims, alleging various items to be outstanding and unpaid on the books of the debtor against Coldaire. However these counterclaims were pressed with a reservation of the trustees' position that under the release of the October contract, there would be no basis for the assertion of any claims by Coldaire against the debtor, and likewise there would be no basis for the assertion of any counterclaims by the debtor against Coldaire. It has been found that the release does not bar Coldaire's claim based on the tooling. But there is no inevitable connection between the claim and counterclaim; it does not follow that because the release does not bar the one, it does not bar the other. And it is my opinion, apparently in agreement with the trustees, that the release does bar the counterclaims. In any event, the special master has concluded that the evidence is insufficient to establish the validity of the indebtedness forming the basis of the counterclaims, and his conclusion is adequately supported by the testimony with respect to the facts of the transactions involved.

The remaining items of the amended reclamation petition, toward which the Court directed the special master's action, are the drawings and the condensing units. The master recommended the allowance of both claims, with the comment that insofar as he could find, there had been no specific denials of these obligations. It appears, however, that there were such denials in the answer to the amended reclamation petition. Nevertheless, the denials are insufficient to overcome the validity of the claims.

With respect to the drawings, the April contract, as quoted in the first Finding of Fact, provided that all plans, designs, etc. should at all times be the property of Coldaire. The debtor's contention that Coldaire's right to the drawings was extinguished by the release contained in the October contract is met by paragraph 7 of that contract, quoted in the fourth Finding of Fact, which provided that the debtor would turn over to Coldaire, without charge, all designs, blueprints and the like. Coldaire having been denied the drawings to which it was entitled, no lien having been found to exist in the debtor's favor, a valid basis exists for the master's recommendation of the allowance of the claim. And I believe that there was competent evidence of value to support the recommendation. There being no general market for property of such unique utility, the value of the drawings must be evidenced by "some other measure." The Manhattan, 3 Cir., 85 F.2d 427, 428. It seems to me that their value is well evidenced by the cost of preparation to someone intending to use them for their specific, unique purpose. Evidence of such cost was given by the manager of the Industrial Engineering Division of the debtor, which included an estimating department. The witness testified that the debtor's estimate of the cost to it of the preparation of the drawings was $5,000. Such an estimate, by a person thus qualified, is, it seems to me, a proper basis for determining value, and the master's finding is not clearly erroneous.

With respect to the condensing units, the denial of the claim in the answer to the amended reclamation petition was based, not upon denial of title, payment in full being admitted; it was based upon the assertion of a lien as security for the payment of an alleged indebtedness. But the validity of the indebtedness has not been established. And here again is evidence of the proper interpretation of the release clause of the October contract, to the effect that it did not affect Coldaire's title to the condensers. Further, with materials, parts and work in process being transferred to Coldaire under that contract, as well as the finished cabinets on hand along with designs and blueprints, and with title to the tools remaining in Coldaire, as has been found, it would be a strained construction indeed that held the condensers, useful in connection with the other items,

to be the property of the debtor under the release. Coldaire having been denied the condensers to which it was entitled and for which it paid in full, a claim for their value is supportable.

The measure of the value of a claim for the condensers would, of course, be their market value at the time in question. But the only evidence of that value was given in the testimony of a witness that some units of the same kind as those claimed were sold at certain prices. Such evidence falls short of establishing market value. Seward v. Pennsylvania Salt Mfg. Co., 266 Pa. 457, 461-462, 109 A. 617. Consequently, the master's recommendation for allowance of the claim for $2,890 based on the value of the condensers, cannot presently be confirmed. However, inasmuch as it would appear that proper evidence of market value is likely to be available, the claim for the value of the condensers will be recommitted to the special master, for the purpose of hearing testimony and making findings and conclusions with respect to the issue of value.

## Conclusions of Law

1. Title to the tools vested in Coldaire under the April 2, 1946 contract between the parties.

2. The tools were paid for in full by Coldaire, in the amount of $40,260.

3. Coldaire was denied possession of the tools for which it had paid and to which it had acquired title.

4. Coldaire's claim for the tools was not released under the mutual release provision of the contract of October 9, 1946.

5. The debtor has no valid counterclaim against Coldaire.

6. The claim of Coldaire in the amount of $40,260 will be allowed.

7. Title to the drawings and condensing units, claimed in the amended reclamation petition, is in Coldaire, and was not released under the mutual release provision of the contract of October 9, 1946.

8. The debtor, having no valid counterclaim against Coldaire, had no valid lien against the drawings and condensing units, and was not entitled to withhold possession from Coldaire.

9. The claim of Coldaire for the value of the drawings, in the amount of $5,000, will be allowed.

10. The claim of Coldaire for the value of the condensing units will be recommitted to the special master with directions to make findings of fact and conclusions of law on the issue of value.